You may proceed. Thank you, Your Honor. May it please the Court, I'm Richard Boothby of Bowles-Rice, I represent the appellant Kanawha County Schools. We're here because the District Court certified a 23B2 class of students who claim that Kanawha for the creation of effective behavior supports. Because the District Court abused its discretion in several ways, we ask that you reverse that certification order and that you remand the case just to consider the individual separate claims of KM and GT. The District Court abused its discretion in at least four ways. First, the District Court approved common questions that turn on the expert's opinion of whether the school board's policies are adequate rather than compliant with state and federal law. An expert's opinion on what is adequate cannot settle the legality of the school board's conduct and therefore cannot drive class litigation forward. Second, the District Court abused its discretion by finding that A2 commonality may turn on quote quality of evidence supporting a cohesive pattern of adequacy. Inadequacy cannot be enjoined or declared illegal. Third, the District Court abused its discretion by certifying a B2 class that seeks unspecified systemic reform of Kanawha County Schools entire special education program, not through final injunctive relief, but through a process of continual improvement. Fourth, the District Court abused its discretion by relying upon the clearly erroneous factual finding that Kanawha County Schools has the highest suspension disparity rate in the state and one of the highest among large schools nationally. There's nothing in the record to support that. A free appropriate public education is the yardstick by which all the adequacy of Board of Education decisions are made, and it turns on individual student needs. Every IDEA case, including this one, is supposed to be about whether a school district provided a student or students with a FAPE. Plaintiffs argue this case is about a local school board's legal duty to create policies and procedures for the provision of effective behavior supports. As a matter of law, the school board has no legal duty to create any policies or procedures. It must follow the state's education policy. The idea that the type of evidence offered by the plaintiffs in support of class certification, a pattern, a practice of inadequacy, ineffectiveness, or even impropriety has consistently- That's a key point, Cakes, what you just mentioned about not having a policy. Opposing counsel seem to indicate you do have some duty to enact a policy. If you don't do it, then how do you know you are meeting your statutory duties and stuff? I mean, it's one thing. I guess the follow where you're going is why would you ever enact a policy if you're going to be held to a policy? So you just won't do it. So I don't know. Is that what you're advocating? That you would never- Anybody in this type of situation would never enact a policy because you don't have to, and if you do, then some liability could attach to it if you don't follow that policy. No, Your Honor. Under Section 1412 of the IDEA, Congress has cleared the state education agency here, the West Virginia Board of Education, has a legal responsibility to create all policies and When you go to Section 1413 of the IDEA, you find out that local education agencies, which is what we are, are required to adopt policies that comply with the state's policy. In West Virginia, every county school board follows the state's policy. In the joint appendix at 948, you'll see the first or second page of policy 2419. That's the policy we follow. And in about the second paragraph near the end, it says, I'm paraphrasing, that this is your procedures and policy manual, and you will not change it without our permission. The legislature went even further. West Virginia Code 1820-5, subsection A3A states, no school board or the state board will adopt policies and procedures under IDEA that exceed the federal requirements. So the question is, is that a merits argument? In other words, whether these policies are actually required under IDEA? How does that weigh on commonality? Well, there are two answers to that. The first one is that any rigorous analysis of compliance with the rule, because the rule is not a pleading standard. The rule has to, you have to adduce evidence that you're complying with the rule. Some of that inevitably, as we learn in Walmart, is going to involve looking at the merits. The second answer is, until the brief in this court from the plaintiffs was received in February, the plaintiffs had never made that argument before. This is our first opportunity to respond to it. However, whatever rigorous analysis of Rule 23 means, it surely means taking a look at two statutes and reading the first two sentences. 1412, state obligations. 1413, LEA obligations. We follow the state's policy. We're not required to draft our own. The IDEA class action, the court's rigorous analysis of compliance with the rule must include a finding that the IDEA was violated. And that can be made as to the whole class in a single stroke, resolving the central issue, was the law violated? An IDEA class action could not proceed otherwise. The district court confirms the necessity of finding a class-wide FAPE determination at JA 1595, where it states whether the plaintiffs ultimately prove that KCS is not providing a FAPE in the least restrictive environment to the class members remains to be seen. So there's no question that as to the whole class, there's a question of FAPE. The judge would have been more accurate to have said a violation of IDEA. One of the points that the plaintiffs make or suggest is that we're saying they have to identify every harm, or we have to make them identify every harm that's going to happen as a result of the alleged inadequacies or ineffective policies. And that's not what we're saying. What we're saying is they have to be able to show in a single stroke that whatever it did, it violated FAPE as to every member or no member of the class. And that's why Jamie S. and City of Springfield, the First and Seventh Circuit Courts of Appeal, have formulated it this way. In an IDEA class action, Rule 23b2 class, you have to allege that the school district is starting with a policy or a well-established procedure that says, we're not going to do this. And we're not going to look at your individual circumstances before we make that decision. That would violate the IDEA. That would not necessarily mean that every student in the class would end up with a denial of FAPE. There can be procedural violations of the IDEA. In other words, they could violate the IDEA, but certain members of the class would never suffer any denial of FAPE. I'll give you an example. If a school district said, we are not going to provide you with any speech services for the first three weeks of school. We're just not going to do it. That is making a decision about what a child will receive without considering their personal circumstances, their needs, their strengths. And that lack of individual inquiry before denying services does violate the IDEA. However, there may be lots of students in that class who didn't need speech services. Procedural violations of the IDEA are not necessarily denials of FAPE. You have to prove a substantive denial of FAPE. The plainest common contentions below were summarized by the district court and Dr. Elliot, their expert, solely about the adequacy of the procedures that KCS uses or does not use to develop behavior supports and whether they were proper. In the joint opinions of 1584 and 1585, you'll find no reference to the IDEA. You'll find no reference to policy 2419. You will find the opinion of one expert being used as the yardstick by which the school board's conduct is being judged. Were there other causes of action alleged besides the IDEA, like the Rehabilitation Act? Yes, there were both ADA, Title II ADA and Rehabilitation Act claims. And the West Virginia Human Rights Law? Yes, that was in there as well. Although, you'll find nothing in the record about that in terms of those claims. Also under Frye, the Supreme Court case, the ADA and Title II, Title II, the ADA and 504 claims are subsumed into the IDEA claims, which is to say these are claims they could not have pursued on their own. They could only have pursued these in pursuance of the rights under the IDEA. So those claims are subsumed by the FAPE claims. Well, what I was getting at is that it strikes me as there are different, several different causes of action here. There is one cause of action. I thought you just told me, all right. I thought you told me that there was also West Virginia human rights. This is not necessarily a question that you're going to disagree with. So maybe you just listen to the whole thing, okay? That there, because there are various causes of actions, there are different standards of and that that in itself creates something that cannot be subject to a class action as it was formed. I hate to make a point for the plaintiffs, but actually under Frye, the FAPE action subsumes all ADA and other claims. In other words, the ADA claims and the other claims are not independent. Children have different disabilities, arguably. Yes. Oh, absolutely. They have different disabilities. There's no question about that. It's just that you would have to prove a denial of FAPE. And then that same set of facts happens to also prove a denial of accommodation under 504 or a lack of equal access under ADA. Or what about the West Virginia Human Rights? I have yet to understand how the West Virginia Human Rights Act has any application of this case, and it doesn't become clearer in the record. Nothing in the district's order mentions it. Our bottom line is that either KCS complies with Policy 2419, the SEA policy, or it does not. After two years of discovery, plaintiffs fail to identify a single policy of the board that does not comply with Policy 2419 or the ADA. The district court stated this at JA 1589. Using Dr. Elliott's opinion as the yardstick for determining IDEA compliance and FAPE was legal error for three reasons. First of all, as already mentioned, LEAs are required to follow SEA policies and procedures not conformed to best practice as determined by one expert. As this court has held for decades, in IDEA cases, absent a statutory violation, the task of education belongs to educators. After two years of discovery, we have yet to hear what the statutory violation was. Again, though, in February of this year, for the first time in an interlocutory appeal of a class certification order, the plaintiffs alleged that the Board of Education has its own independent duty to draft policies under 1412 and 14 other, I believe 1412, 1415, and 1414. The statute couldn't be clearer. The state drafts the policies, the LEAs adopt the state's policies. That, by the way, is true for every state in the Fourth Circuit. The plaintiffs offered no evidence of statutory violations to the district court. They consistently faulted the board for not complying with their experts' opinion about what policies and procedures would be adequate and would have provided effective behavior supports. It's important to remember that their argument is, but for the school board's failure to create policies and procedures for the creation of effective behavior supports, unjustified, whatever that means, unjustified student suspensions wouldn't have occurred. Dr. Elliott's opinion about the school board and whether it has adequate or proper policies for the provision of effective behavior supports is not a legal standard by which the school board's conduct may be judged. Thank you. The district court got this exactly backwards. If you want to continue, you can, and you want to shift some time from your rebuttal. Yeah, I think I would shift two minutes from the rebuttal. So, secondly, the quality of evidence of patterns and trends in data observed by an expert do not show and cannot satisfy commonality under Rule 23. The district court's contrary conclusion is a legal error and abuse of discretion. Can I ask, has there been any talk of subclasses in this case or not? Other than in a couple of the briefs and some mentions, no. Thank you, Your Honor. In JMES and in Springfield, the first in seven circuits, these are cases cited by the district court. These are cases that found a formulation that is the way to apply IDEA within the context of a Rule 23 B2 class. The court cited both those cases and then came to the exact opposite conclusion of what those decisions were. In both of those decisions, the courts rejected the idea that an expert could look at some files, develop their own personal opinion that, well, that denies FAPE, extrapolate that out over the class and say, that's the commonality. Our expert says you denied FAPE to all these people. That's not what JMES said. That's not what Springfield said. But those are the decisions cited by the court. That's legal error. So, you do concede that you could perhaps have subclasses that have the requisite commonality? No. Well, that seems, you're relying on cases which did do that, right? Well, as a factual matter, no. Because here the issue is whether or not we have a legal duty to write behavior policies and we don't. Under either of those cases, what you're looking for is this. Something we did to enjoin. The something, according to those two courts, is this. Denial of services across the board and we don't look at your personal circumstances. We just say we're not going to do it. That is a denial or that is a violation of the IDEA. As to some class members, there may be harm. As to others, there may not be harm. But if that procedural violation of the IDEA results in a substantive denial of faith for a student, then that would violate it. And that's why the courts began with that. Whatever it is they're alleging has to resolve an issue. Its importance is that if we can decide that, if it's true, if it's false, yes or no, then we will know in one stroke that the defendant's conduct is illegal. It should be enjoined as to the whole class or none of the class. And that's not what we have. All right. Let's get to the other side of the case. We'll give you some time for rebuttal.  May it please the court. Most of what we've heard from KCS today relates to how the IDEA does not place affirmative obligations on it to create policies or to be responsive in the area of behavior support. They're saying it's the state's responsibility or it's the principal's or it's the school's or it's the IEP team's. We think that's absolutely wrong, and I'm happy to explain why. But I think the more fundamental point, as Judge Wynn pointed out, is that's a merits question. Their argument all down the line has been we actually do comply with the IDEA because we do have really great policies. We secure the faith that students died through each of these policies. We train people adequately. Now, in their reply brief, they're saying we don't really have to do policies at all. In fact, it's really just the state. There's no legal obligation here. But those are just different ways of trying to attack the merits. Either way, they're sort of arguing that they don't have an obligation under the statute. But that is exactly the kind of common contention that can be resolved on a class-wide basis. As Wal-Mart put it, determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. If they're right about that, in all the arguments they've made here in their reply brief, if they're right, then every class member's claim is going to fail. Of course it is, because the claim is based on the failure to provide these adequate responsive policies. If they're wrong about that, that's going to advance every class member's claim on the merits. And it doesn't have to resolve liability for each one of those claims. It just has to be a single question of law or fact that provides a common answer that drives the litigation forward. And I think basically everything we just heard underscores why this is the kind of case which should be handled on a class basis. And this exact question should be handled in one stroke rather than in a thousand individualized hearings where you're essentially asking the same question about whether or not KCS is doing its job. So what is one question that is common to this whole class? In your brief, you gave me five, but I'm not sure that any of them apply to everyone. So what's one question that's common to all members of this? Well, I think the easiest and the straightforward one is, you know, under 20 U.S.C. 1413A3, the local education agency shall ensure that all personnel necessary to carry out this subject or chapter are appropriately and adequately prepared. So that's a training provision. And our allegation in Dr. Elliott's report says that there's basically no structures in place for training, that the training is inadequate across the board. And that's clearly an obligation, a statutory obligation that's placed on the LEA, and they fail to do it. And we only need one common question. So training alone, the inadequacy of training alone, is a common question that can be resolved on a class-wide basis. So training for what? Training to address behavioral support. So I think the problem is that system-wide, you know, children acting out aggressively as a manifestation of their disability, and system-wide, KCS, no one really has any idea to handle that. You know, there's no, you know, there's no... Well, training to identify students who need behavioral supports, or training to implement behavior supports for children who have already been identified as needing it. Training to track their progress. What's the training? I think it can be training in all of those areas. Because those are different children, right? And your LEAD plaintiffs, for instance, were identified as needing behavioral supports, and they're written into their IEPs. So some of your questions you've identified don't apply to your LEAD plaintiffs. They were identified. They have them in their IEPs. They're being tracked. I'm just trying to figure out what's the one question that would actually apply both to the LEAD plaintiffs and to everyone else in the class, not just policies in general. But it needs to be one question that applies to all these children. And these other courts have noted that when you're looking at multiple steps in the process, you're identifying different questions, not one common question. The common question can't be, is the whole process flawed? It has to be more specific than that. Absolutely, Your Honor. And, you know, so with respect to training, if it were the case that there was proper training about behavioral supports, then there may be other things downstream that may lead to someone not getting FAPE or other problems. But we just have to identify that one question. And there's clearly a statutory obligation on the LEA to do that. So the question is whether it is complying with that. And we have evidence. For example, in Dr. Elliott's report, she says there's a common method called the WVTSS, the tiered system of support, which is a sort of common way of addressing. If we were to affirm an opinion that says this class has identified one common question, and only one, and it is training, and we send it back, and your whole case is about training and nothing else, that would be okay with you? No, Your Honor. I'm happy to talk about other areas. But I think that it would just be a straight affirmance because we don't need to identify one common question. It's up to the district court, I think, if it wants to address other things sort of within the context of a certified class. The question is, should the class be certified? And if we identify one common question, the class should be certified. Now, there might be many supplemental litigation questions about the remedy, what might happen, and how the class is going to proceed. But all we need is one common question under the text of Rule 23a. But I'm happy to talk about other provisions. For example, you know, with respect to monitoring, you know, 141, sorry, 1414. And 14, I should note, you know, they talk about 1412 and 1413. If you look through 1414, which is sort of the font of the actual substantive obligation that the IEA has, you know, over 20 times it mentions the LEA shall ensure. That shall ensure language is the key. So, for example, in the provision I just quoted, D4a, the local education agency shall ensure that the IEP team reviews and revises the IEPs, and then it discusses behavioral supports. And the key point there is the LEA is the proper defendant in all of these lawsuits. If you had an individual lawsuit, you'd be bringing it against the LEA because it's the LEA that ultimately is the backstop, has the ultimate statutory responsibility for ensuring that the provisions of 1414 are actually being properly complied with. That leads to an opportunity for you to respond to the reply brief on what, you know, what you've said is the merits question about who has the obligation for the policies. Because I think their response is, sure, we are responsible for ensuring each child is getting a faith in the least restrictive environment. But we're not responsible for the policies. And if your whole case is now about who writes the policies, we're not responsible for that. So, I wanted to give you an opportunity to respond to that since that came up in the response and reply. Right, Your Honor. So, I mean, we're not saying there's some freestanding, you know, statutory obligation to create policies. But there is a statutory obligation to ensure that all of these things are happening. And it's just... So, it's not about writing the policies? It's just about giving a faith? It is just... No, no, no. It's not about giving faith. It's about ensuring that the provisions of the statute are being met.  It's about following the policies? I mean, what an LEA does fundamentally, you know, you have a decentralized system where you have hundreds of different IEP teams, schools, entities. The only way in which an entity can ensure that something is happening within those decentralized systems is by number one, monitoring and trying to figure out what's actually going on and collecting adequate data to see if the provisions are being complied with. And then number two, you know, having something in place for figuring out what to do when they're not being complied with. And that's a policy. And, you know, the idea that an LEA doesn't create policies, I just think it doesn't make sense to me. And LEA's fundamental role in the system is to create policies. If you look at the first line of the KCS website... Pardon. Pardon. Hi. So sorry, I'm not trying to argue with you. I'm trying to find out what your response is to their statutory and regulatory argument. They say this regulation says state makes the policy and our state has told us not to change the policy without the state's express approval. And I just want to know, do you agree that's a right reading of the regulations and the statutes, even if your argument is, yeah, but you need to have other policies to actually make it work? What's your response to what they said in the reply? That they cannot... I think that it's true to say they cannot have policies that conflict with state policies, but the state policies themselves contemplate that the LEA is going to be the entity that's going to be implementing a lot of these things through their own policies. So, for example, if you look at policy 2419, it's in the JA. So, JA 1032, for example, it says develop an LEA shall develop, implement, and revise district improvement plans, and when found to have a significant discrepancy, review and revise policies, procedures, and practices as necessary to ensure they're in compliance with the IDA in relation to the use of positive behavioral interventions and supports. At JA 1013, county boards of education are required to incorporate and implement in schools a preventive discipline program, which may include positive behavioral interventions and supports. So, all of these things are contemplated in state policy, and then if you look to our expert report, you know, Dr. Elliott, this is at ER 204, page 18 of Dr. Elliott's report, there was little evidence in the records I reviewed to indicate that KCS implements normal and customary policies, such as those identified in policy 2419, including the ongoing collection of student academic achievement and behavior data, and assessments of behavior supports based on those data. So, our contention is that state policy has required this, and, you know, it's briefly mentioned even in the district court's order that they sort of adverted to this idea that really it's up to the state and not up to us, and the district court rightly correct that as a merits question. But I think on the merits, we think we have a very strong argument that KCS absolutely does have responsibilities both under the IDA and under state policy. I, one other thing that I wanted to mention, I think that the sort of fundamental thing that was, that the other side said was, you know, not, it's not clear that every class member is harmed and the effects are different, and I think that goes to some of your questions, Judge Rushing, about, you know, faith is going to be different, each individual is in a slightly different situation, but just because the effects might be different doesn't mean they don't have a common root. And here, you know, it's KCS's failure to meet its statutory obligations that is the common root of all of these problems, and it's resulted in schools across the system, you know, not having, not having really any idea how to deal with children with behavioral supports. And there's no, you know, the idea I think then that the solution to that is thousands of individualized hearings where you just change the IEP is what the, is what the DC circuit, what Judge Tatel called, you know, preposterous, because, you know, firstly, it's obviously very costly and lengthy, but I think more fundamentally, it just doesn't address the problem. You know, you can make. They're recognized that there could be subclasses, right, that it may not, you know, you may not have to go student by student to prove the denial of a faith, but that, you know, if your question is about this policy or that policy, that a subclass tailored to that policy is appropriate rather than kind of all students who were affected by all bad policies. Right, and we have a much, you know, here we have a much narrower class because it just relates to individuals who need behavior supports who have been excluded. So it's not trying to say everyone. It's very targeted at the behavior supports issue specifically. You have students who haven't been identified as needing behavior supports and students who have, I think, but haven't received them in a certain way or who have received them but haven't been monitored. It's, you know, it's more targeted than some of these, but it's still a pretty big diverse group. I agree with that with respect to identification. I think that there is certainly an argument that you could have, you know, a subclass of individuals who have not yet been identified and that that's slightly distinct from the rest. I mean, the rest of the class are individuals who are currently, our allegation is, are not having their behavior supports properly implemented, monitored, and they're subject to inadequate training. I don't think, you know, in DL, there was sort of no overlap between the classes. I think that here they would be, I think, overlap between all of those things. That's basically everyone in the class except for the people who have not yet been identified. So probably two subclasses might make sense in a case like this, but I don't think you would necessarily need four subclasses or more. But I think that's a great point, Judge Rushing. I think that, and I think, you know, to Judge Maltz's point about the ADA, you know, I think that subclasses could be a solution in other directions if you really did think the ADA claims were different. The normal way of handling that, I think, would be to have an ADA subclass. I don't think that necessarily needs to happen now. You know, I think you could well, for example, say, well, there's a common question that's affecting everyone within the class, which is the inadequacy of training or the inadequacy of monitoring. We can certify the class on that basis. If you then have questions of remedy or questions of defenses that only go to a particular statutory, a particular statute or statutory provision, then maybe you could divide them further into subclasses at that point. When it comes to the subgroup, let's say, of students who haven't been identified as needing behavioral supports, don't you have an ascertainability problem as to that group? I don't think so, Your Honor, because, you know, I think ascertainability with respect to, you know, tracing, you know, that sort of very strong form of the ascertainability requirement just doesn't apply, I think, in a B2 class. But we've said to the contrary. Both parties cite this EQT case where, from our court, and it was a B2 and a B3 class, and we very strongly adopted an ascertainability requirement and administrative feasibility, and we didn't say it differed between whether it's looking at the B2 class or the B3. You didn't, but I think it would have, you know, there was no argument that they should come apart for the purpose of that case, and the ascertainability requirement clearly, I think, does apply in a strong form to a B3 class. This court has not said for an exclusively B2 class that it applies, and it would create a circuit conflict with the third circuit and the sixth circuit if it did so. But we said, you know, we said a class can't be certified. We looked at it as an A issue before you even get to whether you're under B2 or B3. I'm just not sure that this panel's free to say we don't have to agree with that. I mean, I just don't think it was really briefed and addressed in any clear way in that case, and I don't think that's, I don't think you should create a circuit split based on that. If you want to sort of address the substance of it, I do think that the tracing point doesn't make that much sense in the context of an injunctive relief plan because the tracing requirement ultimately is identifying people for purposes of damages. You never have to do that. So, the idea that you won't be able to identify, you know, each individual person, I just don't see that marries up with the purposes of the text of B2. But in any event, as we explained in our brief, in this class, in this case, these are ascertainable people. You know, the question is, are they challenging to ascertain? And they wouldn't be challenging to ascertain but for the defendant's conduct, you know, the whole contention. The question is, do you have objective criteria to ascertain who they are? And that seems pretty tricky. Well, I mean, Dr. Elliott's report sets out procedures that other districts and nationwide best practices as to how one identifies people who may require behavioral supports and explains why KCS isn't doing it. So, I think it, we at least, you know, it's objectively true there are people out there who need behavioral supports. That's an objective fact. The difficulty of finding them is itself the thing which is being challenged in the litigation. I think in that context, there's, I mean, there's an additional reason not to apply any ascertainability requirement. And I think as you sort of started out by saying, Judge Rushing, even if that was a concern about that, it would only apply to that particular subclass of people. So, you could say, well, that subclass maybe is not viable but the other, the rest of the class would be. And as the district court sort of acknowledged that by saying, you know, we can always adjust the class definition. That's something that is generally within the district court's discretion. So, I think if this court wanted to affirm the decision overall and say, you know, maybe there needs to be subclass in some areas or maybe there needs to be some modification of the class, I think that's certainly something that would be available. I do think the sort of fundamental question that sort of pressed the idea that everyone just needs to be shown, you know, that it needs to be the same harm that everyone suffers just isn't part of Rule 23b2. It's not our job at this point to show that everyone is going to have suffered an injury at the end of the day. It's just us responsibly have a common contention that one way or the other resolves the case on a class-wide basis. Anything further? I mean, if the court doesn't have any further questions, I mean, I do also want to maybe just stress a couple of additional things about two D.C. circuit cases. I think it's, you know, I think the claim here is very similar to that at issue in D.L. This question of affirmative requirements is basically on all fours of what happened in D.L. Those were provisions of the statute that were the child fine provision and something that is equally, as defendants would, you know, suggest vague, which was the smooth and effective transition from toddlerhood to preschool. That was another subclass in D.L. And all of those things were basically was, you know, was the defendant putting in place adequate policies and structures? The D.C. circuit found that they could. And there was nothing, you know, hugely problematic about the relief. In that case, the court imposed a range of programmatic remedies designed to improve the district method of finding and tracking children, including requirements the district established databases, disseminate information, and report its progress to the court. So there's all this concern about what, you know, how intrusive the injunction could be. I mean, that is completely speculative. We don't know what the injunction is going to be until we even know what the liability findings are going to be. It might be that the district court actually only finds liability as to a couple of these questions and only finds, you know, modest violations and then issues modest injunctions. It's not really our role at this point to say what the exact injunction is going to be. In fact, it's impossible to do so until there's been further litigation. So I think there is a little bit of scaremongering with respect to the sort of intrusiveness in the injunction. And then they have an immediate appeal right with respect to the injunction. If the injunction is overly intrusive, they absolutely can come back to this court and cut it back. But that's no reason to say that this case just shouldn't be certified in the first place. And I think, you know, ultimately, the requirement that, you know, there's got to be some affirmative policy that's, you know, subject to class certification. But if you're just sort of doing nothing, as Judge Wynn said, you know, you just don't make any policies. You just sort of abdicate your responsibilities. And that's what we've pled. That's what our evidence shows. That's what Dr. Elliott shows, that somehow you're insulated from class-wide scrutiny. I just don't think that affirmative versus doing nothing distinction makes any sense. But I think, ultimately, that case really hinges on that distinction in a fundamental way. Thank you very much. You have a few minutes for rebuttals. Thank you. Notably, the plaintiffs in their briefing just now told you to rely on DL. DL does talk about a duty to create policies, practices, and procedures. And that's absolutely correct. The District of Columbia is not an LEA. It's an SEA. That's in the decision. The District of Columbia must comply with 1412. We don't comply with 1412. States do. The District of Columbia and Ohio are the only two school districts in the United States that are both SEAs and LEAs. We have no problem with DL because it doesn't apply to us. Secondly, subclasses are never going to be appropriate if the yardstick is always Dr. Elliott's opinion and not law. During the presentation you just heard, we heard the words proper, best practice. What you didn't hear was a statute that was violated by the school board. And also, they didn't address any of the abuse of discretion arguments that we raised. Again, as to merits, that's black letter law from Walmart. There's going to be some examination of the merits when you're looking at commonality. It is certainly less than rigorous to have to look at two statutes and realize that one says state and one says local. I don't know that you need to have a trial to determine that. We got into some discussion of training. There are only two kinds of training under 2419. And the word training, I should say, is mentioned 25 times in the policy. There are two kinds. WVDE training, that is training from the State Department. And they provide training on very generalized subject. As to class members, there is no common training. Policy 2419 states that if training is required to provide FAPE to a child, it has to be in the IEP. The training itself is individualized to that child's needs. Some children will need training for themselves, for their parents, for their classroom teachers, and their aides. Some will need none of that. So again, you come up against the same problem. Not all class members are going to need the same kinds of training. There was also a mention about what's appropriate as to VIPs and FBAs. Federal law does not define either term. West Virginia law does. Policy 2419 describes what a VIP is, a behavior intervention plan. And all the elements there are optional. There are no mandatory elements. The Forestville case out of the Seventh Circuit that we noted received a request similar to this to add some substantive requirements to what a VIP is. And their statement was, there's no way to violate the substantive requirements of a VIP. Congress doesn't have any. And so they refused the invitation to make up some VIP elements. They just don't exist. The statement that the Board of Education has a duty to ensure certain things happen under 1414 is a little misleading. The start of that section of the IDEA says the state or the LEA must do these things. But the suggestion that Kanawha County Schools doesn't have the adequate staff and expertise to provide behavior supports is not supported by the record. The Board of Education has more board-certified behavior analysts, the gold standard in behavior modification, than any other school district in the state. The data collection issue is, again, a state obligation. They are the ones that have the oversight requirements. Kanawha County Schools has school psychologists, BCDAs, liaisons between every school and the central office. So it's a bit of a stretch to say that we don't have the expertise that we need to provide what these children need. We ask that you reverse the certification order and remand the case for consideration only of GT and KM separate individual cases. Thank you. Thank you. Thank you both for your great arguments. And as I've said to others, and you've heard us say it, we normally come down to shake your hands. You may consider us virtually shaking your hands right now. We will do so perhaps in person later.
judges: James Andrew Wynn, Allison J. Rushing, Diana Gribbon Motz